# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

BELINDA RODRIGUEZ,

        Plaintiff,

   v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:15-cv-01780-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.   INTRODUCTION

On November 24, 2015, Plaintiff Belinda Rodriguez ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.   BACKGROUND

On January 5, 2012, Plaintiff filed a claim for DIB and SSI payments, alleging she became disabled on August 30, 2008, due to "Ptsd—mood disorder—depression—social isolation—suicidal," "PTSD," "Mood Disorder," "Hepatitis C," "Social Isolation," "Severe Depression," "Suicidal thoughts," "Anxiety Disorder," "Paranoid thoughts," and "Visual Hallucinations." (Administrative Record ("AR") 9, 14, 123–25, 139, 256, 262.) Plaintiff was born on April 4, 1964, and was 44 years old on the alleged disability onset date. (AR 17, 262.) From 2000 to 2008, Plaintiff was an in-home care provider. (AR 254, 261.)

### A.   Relevant Medical Evidence[3]

On November 9, 2010, David Hill, MFT, completed a pre-printed form provided by the Employment and Temporary Assistance Department of the County of Fresno. (AR 396.) When asked whether Plaintiff has "a physical or mental incapacity that prevents or substantially reduces their ability to engage in work, training, and/or provide necessary care for their child(ren)," Mr. Hill checked the "Yes" box and commented that Plaintiff "appears to be suffering from PTSD and a mood disorder which impairs her emotional stability, attention, judgement [sic], memory, and ability to be around people." (AR 396–97.) When asked whether Plaintiff is able to work, Mr. Hill checked the "No" box, but then proceeded to indicate that the only limitation or work restriction was that Plaintiff perform a job with "[n]o more than 4th grade reading, writing and/or mathematical skills required." (AR 396.) Mr. Hill indicated that the expected duration of Plaintiff's inability to work was "[t]emporary," and Plaintiff was expected to be released to work in six months. (AR 397.)

On October 18, 2011, Plaintiff was seen "through triage" at the Fresno County Department of Behavioral Health. (AR 347.) The Progress Note from that visit indicated that Plaintiff "has never received [mental health treatment] other than as a child, reportedly." (AR 347.) Plaintiff had "significant psychotic symptoms" and reported "significant [auditory and

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)
[3] As Plaintiff's assertion of error is limited to the ALJ's consideration of her alleged mental disorder, only evidence relevant to that argument is set forth below.

visual hallucinations]." (AR 347.) The Note indicated that Plaintiff's "current symptoms appear to have been chronic and ongoing for some time which lowers the risk [she] will act on her thoughts now." (AR 347.) Plaintiff rents a room from a man who "wants to kick her out for being 'crazy.'" (AR 347.) Her "primary motivation for treatment now appears to be fear that she will lose her housing 'if she doesn't get help and start acting normal.'" (AR 347.)

That same day, October 18, 2011, an undecipherable provider completed another pre-printed form provided by the County. (AR 394–95.) The provider indicated that Plaintiff had "a physical or mental incapacity that prevents or substantially reduces their ability to engage in work, training, and/or provide necessary care for their child(ren)," and commented that Plaintiff "has a history of trauma as a child. Social isolation, paranoid thoughts, severe depression, thoughts of death, worthlessness, anxiety attacks." (AR 394.) The provider indicated Plaintiff is not able to work (AR 394), but such inability to work was temporary and Plaintiff was expected to be released for work in six months. (AR 394–95.)

Plaintiff was diagnosed with schizoaffective disorder on January 4, 2012. (AR 357.) Later that same month, Plaintiff was diagnosed with "major depressive disorder, recurrent, severe with psychotic features." (AR 374.) At that visit, she was prescribed Paxil for depressive symptoms and Risperdal for psychosis. (AR 374.) On February 7, 2012, an undecipherable PhD and licensed marriage and family therapist completed a form provided by the Employment and Temporary Assistance Department of the County of Fresno. (AR 392–93.) The provider indicated that Plaintiff had "a physical or mental incapacity that prevents or substantially reduces their ability to engage in work, training, and/or provide necessary care for their child(ren)," and noted that Plaintiff "is suffering with a psychotic disorder which impairs her reality testing, concentration, judgement [sic], leaving home, [and] being around others." (AR 392.) The provider indicated Plaintiff is not able to work (AR 392), but such inability to work was temporary and Plaintiff was expected to be released for work in one year. (AR 393.)

A "Medication Progress Note" dated February 27, 2012, indicated Plaintiff "has been doing well on Paxil and Risperdal," with "no side effects and feeling improved." (AR 370.) Another "Medication Progress Note" dated April 5, 2012, indicated that Plaintiff is "taking both

Paxil and Risperdal," is "doing well and feels less depressed," and reported a "good response" to those medications. (AR 368–69.)

On April 27, 2012, a Disability Determinations Service psychology consultant, Heather Barrons, Psy.D, reviewed the record and analyzed the case. (AR 123–30) Dr. Barrons observed that Plaintiff had an affective disorder that was "severe," but that Plaintiff's difficulties in maintaining social functioning, concentration, persistence, and pace were "[m]ild." (AR 127–28.) Dr. Barrons noted that, per the medical evidence of record, Plaintiff had no treatment until January 2012, when she presented with depression and reported psychosis. (AR 128.) Dr. Barron observed that Plaintiff was started on Risperdal and Paxil "with good response," and a follow up mental status exam in February 2012 was within normal limits. (AR 128.) Dr. Barrons concluded:

> In consideration of all evidence, [Plaintiff] has only recently begun [treatment] and previously was able to work for a number of years in [the In-Home Supportive Services program]. She showed quick and positive response to medications and had a normal [mental status exam] in 2/12. Given the absence of longitudinal [history] and positive response to [treatment], [Plaintiff] is not expected to meet durational requirements. [Modified onset date] of 1/1/12 is supported by the [medical evidence of record]. IE from [alleged onset date]–12/31/11 given lack of medical evidence of record. Expected to be non-severe by 1/1/13.

(AR 128.)

In May 2012, Plaintiff reported that she "has been unable to afford [P]axil and therefore has not taken it for at least 3 weeks," and she reported "feeling worse and more depressed since April." (AR 366.) In July 2012, Plaintiff indicated she "stopped taking the [Risperdal] because it was not helping," and was prescribed Seroquel instead. (AR 365.) A "Medication Progress Note" dated August 14, 2012, reported that Plaintiff "is feeling better" with Seroquel and "tolerating [it] well so far." (AR 362.) The Note indicated that Plaintiff "complained that no one is helping her," yet "she did not know why she has not signed up for [Medicare,]" which was "extensively discussed last session." (AR 362.)

On November 30, 2012, a Disability Determinations Service psychiatric consultant, A. Garcia, M.D., reviewed the record and analyzed the case. (AR 145–51.) Dr. Garcia noted that

Plaintiff's "[m]ost recent clinic note date[d] 8/14/12 shows continued improvement in [symptoms]" and "[s]uggest[s] [Plaintiff] is capable of perform[ing] sustained unskilled work." (AR 146.) Dr. Garcia found that Plaintiff's ability "to understand and remember detailed instructions" was "[m]oderately limited," but that Plaintiff's ability to "remember locations and work-like procedures," and "to understand and remember very short and simple instructions," were "[n]ot significantly limited." (AR 148.) Dr. Garcia noted that Plaintiff's ability "to carry out detailed instructions" was "[m]oderately limited," but that Plaintiff's ability "to carry out very short and simple instructions"; "to maintain attention and concentration for extended periods"; "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "to sustain an ordinary routine without special supervision"; "to work in coordination with or in proximity to others without being distracted by them"; "to make simple work-related decisions"; and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods" were "[n]ot significantly limited." (AR 148.) Dr. Garcia found that Plaintiff had no "social interaction limitations" and no "adaptive limitations." (AR 149.) He concluded that Plaintiff was "[a]ble to perform 1–2 step job instructions, moderate limitations in performing detailed/complex instructions"; "[a]ble to concentrate and attend while perform [sic] unskilled work activities"; "[a]ble to relate with co-workers, supervisors, and the public"; and "[a]ble to adapt to common stressors and changes associated with an unskilled work environment." (AR 149.)

On December 18, 2012, a "Medication Progress Note" signed by Michael Thao, M.D., indicated that Plaintiff was taking both Risperdal and Seroquel. (AR 495.) Plaintiff reported "her overall mood has been good, she has not been hearing voices," is "living independently and functioning better." (AR 495.) Plaintiff was sleeping well, her appetite was good, and she was tolerating all of the medications well." (AR 495.) Dr. Thao reported that Plaintiff had a normal mood, affective range, insight and judgment, cognition, and sensorium, and her thought processes were "organized." (AR 495.) Plaintiff was advised to stop taking Risperdal and to continue Seroquel. (AR 496.) "Medication Progress Notes" from February and April 2013 stated that

Plaintiff's response to medication and lab results were "[i]mproved" and that she "has responded well" to taking Seroquel. (AR 491–94.)

On August 15, 2013, Ramon Raypon, M.D., saw Plaintiff and noted that "she has not been taking medications for several months." (AR 489.) Plaintiff reported "feeling depressed, nervous, episodes of agitation, irritability, sleeping problems" and hearing voices "every day." (AR 489.) Plaintiff stated she "was doing alright when I was taking medications, feeling less depressed and hearing voices," and wanted to resume medications. (AR 489.) Dr. Raypon noted that Plaintiff appeared "anxious, tense, guarded" and had "poor compliance resulting in more depression, psychosis." (AR 489–90.) Plaintiff was instructed to restart Seroquel. (AR 490.)

Dr. Raypon saw Plaintiff again on October 14, 2013, who was brought in by her mother for a "medication visit." (AR 487.) Plaintiff reported that she still experienced "episodes of depression, 'feeling alone, sad helpless hopeless, low energy,'" and that she is still hearing voices. (AR 487.) Dr. Raypon observed that Plaintiff appeared "relatively calm" and had normal motor activity, cognition, speech, and orientation, and that her thought processes were "organized," "relevant," and "coherent." (AR 487.) Dr. Raypon increased Plaintiff's Seroquel dosage and prescribed an antidepressant. (AR 488.)

Plaintiff was seen by Dr. Raypon a third and final time on December 11, 2013, and reported still experiencing "episodes of depression," with low energy, poor concentration, lack of interests, and withdrawal. (AR 482, 485.) She reported hearing voices and seeing visions at times. (AR 485.) Plaintiff "ran out of medications a few weeks" prior to the visit. (AR 485.) Plaintiff stated that she was living with a roommate and that she "maintained frequent contract with her mother." (AR 485.) Dr. Raypon observed that Plaintiff's motor activity, cognition, speech, and orientation were all normal, and her thought processes were organized, relevant, and coherent. (AR 485.) Plaintiff was "alert" and "responsive," and that she "reported benefits" from the antidepressant. (AR 485–86.) Dr. Raypon's plan was to increase the Seroquel to "control hallucinations and mood." (AR 486.)

On December 16, 2013, Dr. Raypon completed a "Mental Disorder Questionnaire for Evaluation of Ability to Work." (AR 481–82.) The questionnaire asked the following question:

6

> Are there abnormalities in any of the following areas to a degree that it would impair this individual's ability to work? (YES or NO) If yes, would any of these impair the individual's ability to perform simple work for two hours at a time or for eight hours per day? (If so, then check Significant Impairment box)

(AR 481.) Dr. Raypon checked the "YES" and "Significant Impairment" boxes for memory, concentration, and judgment. (AR 481.) When asked whether Plaintiff's "mood and affect [are] affected to a degree that it would impair [Plaintiff's] ability to work," Dr. Raypon checked "Yes," and commented "episodes of depression, poor concentration, and delusions." (AR 481.) Dr. Raypon noted Plaintiff's diagnosis of "major depressive disorder with psychotic features." (AR 481.) The questionnaire also asked:

> Are there abnormalities in any of the following areas to a degree that it would impair this patient's ability to work? (YES or NO) Would any of these impair the patient's ability to perform full-time work, week after week? If so, then check Significant Impairment Box)

(AR 481.) Dr. Raypon checked the "YES" and "Significant Impairment" boxes for hallucinations, delusional or paranoid thoughts, confusion, mood swings, and social isolation. (AR 481.) When asked whether Plaintiff's "social functioning [has] become deficient to the point that it would impair [Plaintiff's] ability to work with supervisors, co-workers, or the public," Dr. Raypon checked "Yes," and commented "periods of hallucinations, delusions." (AR 482.) Dr. Raypon indicated that Plaintiff's mental illness would "impair [Plaintiff's] ability to adapt to stresses common to the normal work environment." (AR 482.) When asked whether any of Plaintiff's prescribed medications would "cause adverse side effects to the degree that such side effects impair the patient's ability to perform normal work," Dr. Raypon responded "[n]ot at this time." (AR 482.) Dr. Raypon indicated that Plaintiff's condition was likely to improve in the next 12 months or less "with medication." (AR 482.)

**B.   Plaintiff's Statement**

On April 1, 2012, Plaintiff's mother completed a function report for Plaintiff. (AR 298–305.) When asked to describe what she did from the time she wakes up to the time she goes to bed, Plaintiff responded "[c]onstantly thinking untill [sic] its [sic] time to sleep worrie [sic] alot [sic] what if someone hurts me I have no friend [sic] only my mom." (AR 298.) Plaintiff stated

7

that she is "scared to close eyes at night won't [sic] sleep till I see day light [sic] I'm scared someone will come in and hurt me if Im [sic] asleep if I wait till [sic] day light no one will come in my house."  (AR 299.)  She responded that she has to be told to change clothes and her underclothes; that she has to be reminded to bathe, to use soap, and to brush her teeth; that she needs help with brushing and washing her hair; that she has to be reminded to shave; that she forgets to eat and whether she has eaten; and that she can use the toilet by herself.  (AR 299.)  Plaintiff needs reminders to take care of her personal needs, grooming, and taking medication, but did not specify in the report the nature of the help or reminders needed.  (AR 300.)  Plaintiff does not prepare her own meals because she is "always leaving the gas [on the stove] on."  (AR 300.)  She does not do any house or yard work because she "just don't [sic] care."  (AR 300–301.)  Plaintiff stated the "don't [sic] like going anywhere" outside, and does not do any shopping or leave her house.  (AR 301.)  According to Plaintiff, sleeping is all she wanted to do, and when she's not sleeping she "thinking if some one [sic] try to come in my house scared."  (AR 302.)  Plaintiff's mother visits every day she can, brings Plaintiff food, helps Plaintiff remember to "take care of [herself]" and cleans Plaintiff's house.  (AR 302.)  Plaintiff does not go anywhere on a regular basis, and needs to be reminded to go places and someone has to accompany her.  (AR 302.)  She indicates that she has problems getting along with family, friends, neighbors, or others, but does not explain that nature of the problems, only that she's "always been a loner."  (AR 303.)  Plaintiff stated that her disability affects her hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  (AR 303.)  Plaintiff can't pay attention, does not finish what she starts, can't follow written instructions, and needs to "repeat constantly" spoken instructions and "can't remember what [is] being said."  (AR 303.)  She does not socialize with others, and fears that "every one [sic] [is] always talking about me and staring at me[,] their [sic] mean to me and don't like me."  (AR 304.)

**C.   Administrative Proceedings**

Plaintiff filed an application for DIB and SSI on January 5, 2012, alleging she became disabled on August 30, 2008.  (AR 9, 14, 123–25, 139, 256, 262.)  The agency denied Plaintiff's

applications for benefits initially on April 27, 2012, and again on reconsideration on December 14, 2012.  (AR 49–164, 167–171, 175–180.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 181–82.)  On January 21, 2014, Plaintiff appeared with counsel and testified before an ALJ.  (AR 23–48.)

### 1. Plaintiff's Testimony

Plaintiff testified she was 49 years old at the time of the hearing.  (AR 27.)  The highest level of education Plaintiff completed was sixth grade.  (AR 28.)  Plaintiff said she lived in a duplex with a roommate.  (AR 28.)

Plaintiff testified that she needs help in the mornings getting out of bed, and that her mother comes over in the mornings to check on Plaintiff.  (AR 29.)  Plaintiff said that she does not perform any household chores and uses the microwave for cooking.  (AR 29.)  She testified that she accompanies her mother to the store.  (AR 30.)  She said in a "typical day" she will sit and watch television or sit and think.  (AR 30.)  Plaintiff testified that she "used to try walking, like going around the block," but would "get stuck."  (AR 30.)  Plaintiff said she took a nap every day and was in bed by 8:30 pm. (AR 30.)

Plaintiff testified that she hears voices "like my daddy yelling at – really angry, or I hear a voice.  I don't know whose voice it is, and then they tell me do things, you know, like ugly things."  (AR 37.)  When asked how often she heard things, Plaintiff responded "[s]omeone's always telling me something . . . you know, in my life, or to do stuff.  I'll hurt my neighbors, or I mean anything just sets me off, you know.  I don't have any friends."  (AR 38.)  Plaintiff testified that she used to act on the voices, and has heard the voices since she was in the fourth or fifth grade.  (AR 38.)  Plaintiff testified that she has problems getting along with people.  (AR 38.) Plaintiff's roommate would "come and check on [her], or . . . help [her] out of the bed."  (AR 39.) She said her mom "does everything," including pay her bills and buy food, although Plaintiff testified that she could "go to the store and [] can buy something."  (AR 40.)  Plaintiff testified that at the time of the hearing she was taking Cymbalta and Seroquel.  (AR 40)  She said the Cymbalta "helps," and the Seroquel helps her sleep at nighttime.  (AR 40.)  Plaintiff testified that she still "hear[s] stuff," but the Seroquel "blocked a lot of seeing . . . ugly stuff."  (AR 40.)

9

Plaintiff said she doesn't "like being around people" she doesn't "trust [herself.]" (AR 42.) She testified that she "know[s] what [she's] capable of doing, and [she] know[s] what [she's] done in the past," and she "tr[ies] to stay away from people because anything upsets [her] . . . [she] would have this adrenalin of actually stabbing people . . . [a]nd [she] got into a habit of that for no reason, just anybody who upset [her.]" (AR 42.) Plaintiff said she'd rather not be around people "because everyone upsets me," and she "know[s] how easy it is for her to hurt somebody." (AR 42.)

When asked whether she could remember and follow three or four "easy instructions," Plaintiff responded that she "would have to ask at least what did you tell me, a couple of times. I would have to know what you said before." (AR 44.) Plaintiff testified that she has problems "memorizing, understanding what exactly [she's] supposed to do," and "will hold onto maybe two or three of your words, and try to go with that," but then forgets what she is "supposed to do with it." (AR 44.)

### 2. Vocational Expert's Testimony

The Vocational Expert ("VE") identified Plaintiff's past work as a home attendant, Dictionary of Operational Titles (DOT) code 354.377-014, which was medium exertional work with a specific vocational preparation (SVP)[4] of 3. (AR 45.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and work background. (AR 45.) The VE was also to assume this person had no exertional limitations but was restricted to simple, routine tasks. (AR 45.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform unskilled, medium, light, and sedentary jobs. (AR 45.) Specifically, the VE testified that if the person could lift 50 pounds; carry 25 pounds; sit, stand, or walk six to eight hours in a day with frequent stooping; perform simple and routine tasks; and have occasional public contact, she could perform work as a cook's helper, DOT code 317.687-010, medium exertion level, unskilled, and SVP 2, for which there are 20,700 jobs. (AR 46.) The ALJ also

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

testified that such a person could perform work as a food service worker in hospitals, DOT code 319.677-014, medium exertion level, unskilled, and SVP 2, for which there are 6,000 jobs, and could also perform work as a dishwasher, DOT code 319.687-010, medium exertion level and unskilled, and SVP 2, for which there are 32,500 jobs, "approximately times nine for the nation." (AR 46.)

The VE was also asked to consider a person of Plaintiff's age, education, and work background but could lift 20 pounds; carry 10 pounds; sit, stand, or walk six to eight hours in a day with occasional stooping, crouching, crawling, climbing, kneeling; perform simple and routine tasks; and have occasional public contact. (AR 46.) The VE testified that such a person could perform work doing office cleaning, DOT code 323.687-014, light exertion level and unskilled, and SVP 2, for which there over 20,000 jobs, and could perform work as a can filler, DOT code 529.685-282, light exertion level and unskilled, and SVP 2, for which there over 21,000 jobs. (AR 46.) The ALJ also testified that such a person could perform work as a marker in a production capacity, DOT code 920.687-126, light exertion level, unskilled, and SVP 2, for which there are 21,500 jobs, "times nine for the nation." (AR 46.)

The ALJ asked the VE to assume the same person of Plaintiff's age, education, and work background who could lift 20 pounds; carry 10 pounds; sit, stand, or walk six to eight hours in a day with occasional stooping, crouching, crawling, climbing, kneeling; perform simple and routine tasks; have occasional public contact; but would also miss four days a month. (AR 46.) The VE testified that no jobs were available for that person. (AR 46.) The VE was also asked whether there would be any jobs for a person of Plaintiff's age, education, and work background who could lift 20 pounds; carry 10 pounds; sit, stand, or walk six to eight hours in a day with occasional stooping, crouching, crawling, climbing, kneeling; perform simple and routine tasks; have occasional public contact; but would be off task by 20 percent – the VE testified that there would be no jobs available for such a person. (AR 47.)

**D.     The ALJ's Decision**

In a decision dated March 21, 2014, the ALJ found that Plaintiff was not disabled. (AR 9–18.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR

11–18.) The ALJ decided that Plaintiff has not engaged in substantial gainful activity since August 30, 2008, the alleged onset date (step 1). (AR 11.) The ALJ found that Plaintiff had the severe impairments of (1) lumbar degenerative disc disease, (2) mild scoliosis, (3) major depressive disorder with psychotic features, and (4) psychotic disorder (step 2). (AR 11–12.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3). (AR 12–13.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[5]

> to perform medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c) except lift and carry 50 pounds occasionally and frequently 25 [pounds]; stand, sit, and walk 6 to 8 hours out of an 8-hour day; and frequently stoop. [Plaintiff] can perform simple routine tasks with occasional public contact.

(AR 13.)

The ALJ determined that, given her RFC, Plaintiff was unable to perform any past relevant work (step 4), but that Plaintiff was not disabled because she could perform a significant number of other jobs in the local and national economies, specifically cook's helper, food service, and dish washer (step 5). (AR 17–18.) In reaching her conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 16–17.)

### III.     SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

12

and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.     APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the

ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

Plaintiff contends that "[t]he ALJ has neither offered a legitimate conclusion or a legally sufficient reason why he rejects the opinion of Dr. Raypon." (Doc. 16 at 5.) The Commissioner contends "substantial evidence supported the ALJ's rejection of Dr. Raypon's December 2013 opinion that Plaintiff was disabled." (Doc. 18 at 8.)

### A. Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or

examining professional may be rejected for "specific and legitimate" reasons, and those reasons must be supported by substantial evidence in the record. *Id.* at 830–31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). If an ALJ opts to not give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c)(2)(i)–(ii) and (c)(3)–(6) in determining how much weight to give the opinion. These factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii), (c)(3)–(6).

**B.     The ALJ Did Not Err in His Assessment of the Opinion of Treating Physician Dr. Raypon.**

Plaintiff was treated by Dr. Raypon on three occasions, from August 15 to December 11, 2013. (AR 14–15, 481–82, 485–90.) Dr. Raypon diagnosed Plaintiff with major depressive disorder with psychotic features. (AR 481.) His clinical findings included significant impairment of memory, concentration, and judgment, and episodes of depression, poor concentration, and delusions. (AR 481.) He also found that Plaintiff's ability to work would be significantly impaired by hallucinations, delusional or paranoid thoughts, confusion, mood swings, and social isolation. (AR 481.) It was Dr. Raypon's opinion that Plaintiff's social functioning [had] become deficient to the point that it would impair [Plaintiff's] ability to work with supervisors, co-workers, or the public," and that Plaintiff's mental illness would "impair

15

[her] ability to adapt to stresses common to the normal work environment." (AR 481–82.) Dr. Raypon's prognosis for Plaintiff was that her condition was likely to improve in the next 12 months or less "with medication." (AR 482.)

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Raypon's opinion is contradicted by the medical opinion evidence of Disability Determinations Service psychiatric consultant Dr. Garcia, who opined that Plaintiff could perform work that was simple and repetitive, and could relate to coworkers, supervisors, and the public.[6] (AR 16, 149.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Raypon's opinion. In rejecting Dr. Raypon's opinion, the ALJ stated:

> Dr. Raypon completed a Mental Questionnaire dated December 1, 2013. He notes that claimant's diagnoses as major depressive disorder with psychotic features, with hallucinations, delusional or paranoid thoughts, confusion, mood swings and social isolation. He notes significant impairments in memory, concentration, and judgment. She would have significant problems with hallucinations, confusion, social isolation and mood swings. She would likely improve with medications (Exhibit 9F, p. 3). Limited weight is afforded this assessment. Dr. Raypon has a very brief history of treating the claimant, and it is apparent from the records that when the claimant is compliant, her symptoms are significantly abated.

(AR 15.)

### 1. Objective Medical Evidence

The ALJ properly rejected Dr. Raypon's assessment of Plaintiff because it was not supported by the objective medical evidence, specifically by findings that when Plaintiff is compliant with medication, her symptoms are "significantly abated." An ALJ may properly discount a treating physician's opinion that is not supported by the medical record. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (noting that "an ALJ may

---

[6] Plaintiff contends, with no factual support, that the ALJ gave "more weight to the non-examining opinion of the state agency physician." (Doc. 16 at 8.) To the contrary, the ALJ only accorded "[l]imited weight" to the opinions of the state agency physicians' opinions, observing that those physicians "did not have the opportunity to review evidence received at the hearing level." (AR 16.) In so doing, the ALJ correctly noted that the state agency physicians "were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians." (AR 16.)

discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings") (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

To the extent that Plaintiff relies on *Embrey v. Bowen*, 849 F.2d 418 (9th Cir. 1988), for the proposition that the ALJ must discuss the evidence supporting a conclusion with sufficient specificity, s*ee* Doc. 16 at 5, *Embrey* is distinguishable. In *Embrey*, the court held that an ALJ's determination that sufficient objective findings do not support a treating physician's opinion is not, without more, a sufficiently specific reason to reject that opinion. 849 F.2d at 421–22. Here, the ALJ found the objective medical evidence showed that, contrary to Dr. Raypon's assessment, when the claimant is compliant, her symptoms are significantly abated. The ALJ discussed the objective medical findings relevant to this conclusion. The ALJ noted that treatment notes from February and April 2012 indicated Plaintiff was doing well on medications, with no side effects, and was feeling improved. (AR 14, 368–70.) The ALJ observed that in August 2012, Plaintiff reported feeling better with Seroquel. (AR 14, 362.) The ALJ noted that Dr. Thao's "Medication Progress Note" from December 2012 indicated that Plaintiff presented on time, her mood was good, she had not been hallucinating, and she was tolerating medications well. (AR 14, 495.) Dr. Thao's report was that Plaintiff had a normal mood, affective range, insight and judgment, and cognition. (AR 14, 495.) The ALJ further observed that a "Medication Progress Note" from February 2013 showed Plaintiff's was improved with medications, was taking Seroquel and had responded well. (AR 14, 493–94.) In this case, unlike in *Embrey*, the ALJ's discussion of the objective medical evidence did not lack specificity.

Moreover, the ALJ discounted Plaintiff's credibility in this case, relying in part on the objective medical evidence, including evidence that "medications have been relatively effective in controlling [Plaintiff's] symptoms," to find that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, [Plaintiff's]

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC], which does incorporate certain limitations that are well supported by the medical evidence of record." (AR 16–17.) Plaintiff has not adequately challenged the sufficiency of the evidence supporting the ALJ's adverse credibility finding in this case or the adequacy of the ALJ's reasons given to explain this finding.[7] Therefore, the Court considers the ALJ's unchallenged credibility finding to be binding. S*ee, e.g., Stanley v. Astrue*, No. 1:09–cv–1743 SKO, 2010 WL 4942818, at *6 (E.D. Cal. Nov. 30, 2010).

Thus, substantial evidence supports the ALJ's finding that when Plaintiff is compliant with her medication regimen, her symptoms are lessened. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *see also Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and noting that claimant's impairments were responsive to medication). Accordingly, the lack of supporting medical evidence, as evidenced by Plaintiff's effective treatment regimen, was a specific and legitimate reason for the ALJ to discount Dr. Raypon's assessment. *See Batson*, 359 F.3d at 1195; *Thomas*, 278 F.3d at 957.

### 2. Length of Treatment Relationship

The ALJ also accorded "[l]imited weight" to Dr. Raypon's assessment of Plaintiff due his "brief history of treating [Plaintiff]." (AR 16.) Although the Commissioner asserts the ALJ properly rejected Dr. Raypon's opinion on this basis, this is not a legitimate reason for rejecting the opinion of Plaintiff's treating physician. The ALJ observed that Dr. Raypon saw Plaintiff

---

[7] In her opening brief, Plaintiff asserts that the ALJ "improperly rejected the testimony of [Plaintiff.]" (Doc. 16 at 3.) Other than this naked assertion, however, Plaintiff offers no argument to support her contention, and the Court declines to formulate one for her. *See, e.g., Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading [the plaintiff's] brief, one wonders if [the plaintiff], in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort through the noodles in search of [plaintiff's] claim") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . [j]udges are not like pigs, hunting for truffles buried in briefs.")). *See also Greenwood v. Fed. Aviation Admin*., 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ."); *Hibbs v. Dept. of Hum. Resources*, 273 F.3d 844, 873 n.34 (deeming a one-sentence argument "too undeveloped to be capable of assessment.")

three times, beginning on August 15, 2013. (AR 14.) An ALJ may properly consider the length of treatment and the frequency of examinations in assessing what weight to give a treating source's opinion. 20 C.F.R. § 404.1527(c)(2)(i); *see also Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1038–39 (9th Cir. 2003) (duration of treatment relationship and frequency and nature of contact relevant in weighing opinion); *Edlund v. Massanari*, 253 F.3d 1152, 1154, 1157 (9th Cir. 2001). However, the presence of a limited treatment relationship cannot alone constitute a legitimate reason for rejecting a treating source's opinion.[8] *See Cox v. Berryhill*, No. 2:15-cv-2221 AC, 2017 WL 714384, at *6–7 (E.D. Cal. Feb. 23, 2017) ("[T]he rules state that a treating relationship can be established so long as the treating visits are consistent with the type of treatment, and can be as infrequent as two times per year. The Commissioner does not explain why it makes any sense, or could be within the meaning of the regulations, to accept a doctor as a treating source even though she only sees the patient twice a year, but to then reject the opinions offered on the grounds that the doctor only sees the patient twice a year.") (internal citations omitted); *Cherease Shanta Scott Daniels v. Colvin*, No. CV 15–01838–RAO, 2016 WL 797545, at *5–6 (C.D. Cal. Feb. 29, 2016); *Trepanier v. Colvin*, No. CV 13–9027–DFM, 2014 WL 4236944, at *4 (C.D. Cal. Aug. 26, 2014) ("[T]he fact that Dr. Qazi saw Plaintiff only three times is not alone a sufficient basis to reject his opinion outright . . . ."); *Bayze v. Colvin*, No. CIV 12–768–TUC–CKJ, 2014 WL 2113097, at *3 (D. Ariz. May 21, 2014). *Cf. Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994) (holding that a physician was the claimant's treating physician, and thus his conclusions were entitled to deference, where the claimant saw physician twice within a 14–month period, saw no other doctors during that period, requested that the physician treat him, and the physician referred to the claimant as "my patient"). Here Dr. Raypon's opinion was based on more than a single consultative exam, and the basis for his

---

[8] To hold otherwise would render the opinion of an examining physician worthless. If a limited treating relationship constituted a legitimate reason for rejecting an opinion from a treating or examining source, an opinion from an examining source would always be rejected because the relationship between a claimant and an examining physician is generally limited to a single examination. *See Grayson v. Astrue*, No. 2:11–cv–1656–EFB, 2012 WL 4468406, at *5 (E.D. Cal. Sept. 25, 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (holding that while a limited treating relationship may be a valid reason for not according a treating physician's "findings the conclusive weight of a treating medical-source opinion, . . . it is not by itself a basis for rejecting them – otherwise the opinions of consultative examiners would essentially be worthless . . . .")). Opinions from examining sources, however, are often relied upon by ALJs in determining whether a claimant is disabled.

findings and the reasons for his conclusions are set out in his reports. (*See* AR 485–90.) The ALJ did not state any reason why Dr. Raypon's opinions could not be reached after three visits over a four-month period, and his opinion should not have been summarily dismissed on this basis. Accordingly, the short duration of treatment provided by Dr. Raypon does not constitute a legitimate reason for rejecting, or according "[l]imited weight" to, his opinion.

However, because the ALJ articulated another, permissible reason for rejecting Dr. Raypon's assessment of Plaintiff, namely the lack of support in the medical record, this error is harmless. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal.") (quoting *Batson*, 359 F. 3d at 1197). As set forth more fully above, the ALJ provided a sufficiently specific and legitimate reason to reject the opinion of Plaintiff's treating physician Dr. Raypon, and therefore neither reversal nor remand is warranted.

### VI.   CONCLUSION AND ORDER

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 6, 2017**                         /s/ *Sheila K. Oberto*
                                                             UNITED STATES MAGISTRATE JUDGE